1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  KEVIN J. BARRY (CABN 229748)
   Assistant United States Attorney
5
      450 Golden Gate Ave., Box 36055
6     San Francisco, California 94102
      Telephone: (415) 436-7200
7     Fax: (415) 436-7234
      E-Mail: kevin.barry@usdoj.gov
8
   Attorneys for Plaintiff
9

10            UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,        )   No. CR
                                     )
15        Plaintiff,                 )
                                     )
16     v.                            )   NOTICE OF PROCEEDINGS ON OUT-
                                     )   OF-DISTRICT CRIMINAL CHARGES
17  JASON M. GLAVIS,                 )   PURSUANT TO RULES 5(c)(2) AND (3)
                                     )   OF THE FEDERAL RULES OF
18        Defendant.                 )   CRIMINAL PROCEDURE
                                     )
19  _____  )

20

21        Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal

22  Procedure that the above-named defendants has been arrested based upon an arrest warrant (copy

23  attached) issued upon an

24        ☐    Indictment

25        ☐    Information

26        ☒    Criminal Complaint

27        ☐    Other (describe) _____

28  pending in the Eastern District of Wisconsin, Case Number 11-M-497.


RULE 5 NOTICE

1     In that case, the defendants are charged with a violation of Title 21, United States Code,

2 Sections 841(a)(1), 841(b)(1)(B), and 846 – conspiracy to possess with intent to distribute more

3 than 100 kilograms of marijuana, and a violation of 18 U.S.C. § 1956 – conspiracy to commit

4 money laundering.

5

6 DATED: September 15, 2011                 Respectfully submitted,

7                                   MELINDA HAAG

8                                   United States Attorney

9

10                                 KEVIN J. BARRY

                                  Assistant United States Attorney

1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

v.

DAVID S. MAKAR,
JASON M. GLAVIS,
PERRI FORGHANI, and
TIMOTHY D. DYE.

### CRIMINAL COMPLAINT

CASE NUMBER:  11 - m - 497

I, Jeffrey J. Hale, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning sometime in 2008, and continuing to February 8, 2011, in the State and Eastern District of Wisconsin, and elsewhere, David S. Makar, Jason M. Glavis, Perri Forghani, and Timothy D. Dye:

a.    Knowingly conspired with each other, Christopher A. Younger, and others known and unknown, to possess with the intent to distribute and distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(B), and 846; and

b.    Knowingly and intentionally conspired with each other, Christopher A. Younger, and persons known and unknown to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), which makes it unlawful for one who knows that property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct a financial transaction in and affecting interstate commerce, which transaction involves the proceeds of specified unlawful activity, with intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity, to wit: proceeds of violations of Title 21, United States Code, Sections 841(a)(1) and 846 in violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Task Force Agent assigned to the Drug Enforcement Administration, and that this complaint is based on the facts contained in the attached affidavit.

Continued on the attached sheet and made a part hereof:          ✔ Yes

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

September    9th , 2011
Date

William E. Callahan, Jr., U.S. Magistrate Judge
Name & Title of Judicial Officer

at   Milwaukee, Wisconsin
     City and State

_____
Signature of Judicial Officer

## AFFIDAVIT FOR CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Jeffrey J. Hale, having been duly sworn on oath, state as follows:

## I.    TRAINING AND EXPERIENCE

1.      I am a state certified law enforcement officer employed by the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), and have been so employed since October of 1999. Prior to becoming a special agent with DCI, I was a police officer with the Milwaukee Police Department (MPD). I am also a federally deputized task force agent with the United States Department of Justice, Drug Enforcement Administration (DEA).

2.      I have had formal training in the investigation of drug trafficking. I have worked with numerous informants in the investigation of drug trafficking in the State of Wisconsin. I have directed informants during controlled buys of controlled substances, undercover meetings with individuals, and monetary payments to drug traffickers for past controlled substances received. I have participated in the execution of numerous state and federal search warrants in which controlled substances, drug paraphernalia, drug proceeds, and financial records were seized. I am familiar with the street names of various drugs, including marijuana, heroin, cocaine, and cocaine base. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the State of Wisconsin and elsewhere.

3.      I have participated or assisted in numerous state and federal search warrants for narcotics related offenses. These warrants involved the search of locations ranging from residences and businesses of targets, their associates and relatives, "stash houses" (houses used as controlled substance/money storage locations), and storage facilities. Evidence searched for, and recovered, in these locations have included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments, and various assets that were

1

purchased with the proceeds of drug trafficking. I have had numerous discussions with other experienced law enforcement officers, and have conducted and been present at numerous interviews of self admitted narcotics traffickers and cooperating defendants concerning the manner in which drug traffickers and money launderers operate.

4. In the course of my employment and experience, I have also become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Among these techniques are the use of counter surveillance, multiple locations at which to conduct narcotics related activities, hidden compartments in vehicles used to hide narcotics and currency, the use of pagers, voice mail, cellular telephones, pay phones, email, and the use of numerous associates and "workers" to further their criminal organization. I have also become aware of the various techniques individuals use to conceal the source or nature of drug proceeds. Among the techniques utilized are the purchase of assets and financial instruments in nominee names using cash and "structuring" transactions so as to avoid certain reporting requirements of financial institutions.

5. Based upon my training and experience, I know that a "controlled buy" is a term which refers to a situation in which a confidential informant or source (herein referred to as CI) works with a law enforcement officer regarding the purchase of a controlled substance from person(s) at a known address; that the law enforcement officer searches the person and clothing of the CI to make sure that the CI has no controlled substances or money; that the law enforcement officer gives the CI money and watches the CI walk into the known residence; that the law enforcement officer watches the CI walk out of the residence at that address a short time later and return to the law enforcement officer; that the CI gives the law enforcement officer the controlled substance which the CI has purchased inside the residence at that address, and relates

2

to the law enforcement officer the circumstances of the purchase; and that the law enforcement officer again searches the CI to make sure that the CI has no controlled substances or money on the CI's person or clothing.

6. Based on my training and experience, and on conversations with other experienced law enforcement officers who have participated in drug trafficking and money laundering related searches, it is my opinion that:

a. People involved in large scale drug trafficking and/or money laundering almost always keep records of their transactions. Because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, bank records, and other evidence of the accumulation of wealth through their illegal activities, as well as the methods used to launder the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on my training and experience. Such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses and/or storage facilities.

b. Drug traffickers who amass the proceeds of their enterprise quite often secure their money within secure locations within their dominion and control, often in their residences, businesses, and storage facilities, and often in safes or other secure containers.

c. Large scale drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people within the organization. As a result, people who traffic in narcotics or launder money for such organizations will possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates.

7. Based upon my training, experience, and participation in financial investigations involving money laundering or other efforts by defendants to conceal assets to avoid the detection of those assets by law enforcement, I have learned that:

a. Individuals attempting to conceal their illegal activities will frequently place assets obtained with proceeds of criminal activity in the names of friends, relatives, trusted associates, or fictitious entities to avoid detection of these assets by the Internal Revenue Service and other government agencies. Even though these assets are in the names of others, the true owners will continue to exercise dominion and control over the use, ownership, and disposition of these assets.

b. Individuals involved in money laundering will utilize checking and savings accounts at financial institutions in the names of relatives, friends, trusted associates, or fictitious business entities. These relatives and associates also conduct financial transactions on the individuals' behalf utilizing monetary instruments, including wire transfers of monies into foreign accounts outside the United States.

c. Individuals involved in money laundering will frequently have some sort of legitimate income or funds and co-mingle their criminal profits with their legitimate funds. This helps conceal the illegal source. Monetary instruments can then be acquired against the funds in the account or a check can simply be written on the account without creating any Currency Transaction Reports (CTRs) or Suspicious Activity Reports (SARs).

d. Individuals involved in money laundering will frequently allow third parties and/or co-conspirators to make cash deposits to their bank accounts. An individual depositing currency is not typically required to show identification to banking officials, therefore, a third party can go to a bank branch anywhere in the U.S. and deposit cash to an account that is not held in their name. Because the funds are deposited in cash, the account holder, who can be in a different state, can then go to their local bank branch and immediately withdraw the funds in cash. This method of transferring money provides for an almost instantaneous transfer of funds that could not be achieved through the shipping of bulk currency via common carrier and maintains the virtual anonymity of the third party making the deposit which would not be possible if transferring money through wire a service business such as Money Gram or Western Union.

e. Individuals who are attempting to conceal their illegal activities from the IRS and other government agencies commonly hide records that will establish their true ownership of assets. Such records typically include: bank statements, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, automobile titles, property deeds, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

f. Individuals who seek to hide such records typically keep those records in a place that is secure but easily accessible, such as their personal residences, garages,

4

automobiles, storage facilities, safety deposit boxes, briefcases, purses, and safes or security storage containers.

8.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

## II.   INDIVIDUALS FOR WHOM A CRIMINAL COMPAINT AND ARREST WARRANTS ARE SOUGHT

9.    Based on the information below, I believe that probable cause exists to believe that beginning sometime in 2008, and continuing to February 8, 2011, in the State and Eastern District of Wisconsin, and elsewhere, David S. Makar, Jason M. Glavis, Perri Forghani, and Timothy D. Dye:

- a. knowingly conspired with each other, Christopher A. Younger, and others known and unknown, to possess with the intent to distribute and distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(B), and 846; and

- b. knowingly and intentionally conspired with each other, Christopher A. Younger, and persons known and unknown to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), which makes it unlawful for one who knows that property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct a financial transaction in and affecting interstate commerce, which transaction involves the proceeds of specified unlawful activity, with intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

  - i. The specified unlawful activity involved in the offense is the distribution of controlled substances and conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

  - ii. The object of the conspiracy was to conceal the source, ownership, and control of the proceeds of drug trafficking which were received by Christopher A. Younger.

All in violation of Title 18, United States Code, Section 1956(h).

10.     I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below from; my review of recorded calls to date, oral and written reports of other law enforcement officers participating in this and related investigations, and records, documents, and other evidence obtained during this investigation. The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, documentary evidence; court-authorized electronic surveillance, recorded telephone calls, controlled payments of money, search warrants, and physical surveillance.

11.     Because this affidavit is submitted for the limited purpose of securing a criminal complaint and corresponding arrest warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested criminal complaint and corresponding arrest warrants.

## III.    PROBABLE CAUSE

### A. Summary of the Investigation to Date

12.     The investigation to date has shown that Milwaukee based marijuana dealer Christopher A. Younger obtained marijuana from various sources of supply in California from mid 2008 through early 2011. Younger's primary source of supply (SOS) was David S. Makar. Younger also received marijuana directly from Jason M. Glavis and Timothy D. Dye. The subsequent sale of the marijuana in the Milwaukee area generated large sums of cash for the drug trafficking organization (DTO). Younger paid for the marijuana by mailing bulk cash to sources, wire transferring funds to sources, making third party deposits of cash to accounts controlled by sources, and depositing checks to accounts held by sources.

6

13.     The money laundering offenses referred to in this affidavit relate to the third party deposits of currency and checks into accounts that were held by or ultimately controlled by Makar and his girlfriend Perri Forghani, as well as the mailing of U.S. currency to SOS Makar and Forghani. These deposits and corresponding withdrawals were used to promote the carrying on of the DTO. In order to pay Makar for marijuana, Younger made third party cash deposits at Milwaukee area bank branches into accounts controlled by Makar and Forghani. The funds were then withdrawn, in cash, at California branch locations. Younger structured several of these cash transactions by making same day deposits at different branch locations, and into different accounts. Younger also paid Makar by writing checks from his business and personal accounts. Younger wrote false entries in the memo line of these checks in order avoid making bank tellers suspicious of the large deposits he was making. Younger wire transferred funds (drug proceeds deposited into his accounts) to accounts controlled by SOS Glavis. Younger also mailed drug proceeds from the Milwaukee area directly to Glavis and SOS Dye in California.

**B. Recovery of Younger's binder and initial investigation**

14.     During the Spring of 2010, case agents were contacted by Detectives from the Waukesha County Sheriff's Department, who were requesting assistance with an investigation of Christopher A. Younger, the owner of a business called Olympia Metals located at Younger's residence in Pewaukee, WI. Waukesha County Sheriff's detectives were in possession of a black leather folder/binder, which a citizen had found in the ditch along the roadway in Pewaukee and turned in to law enforcement. The binder contained what case agents believe to be numerous drug notes and drug ledgers. Based on the contents of the binder, which included handwritten notes, e-mails, spreadsheets, and other items, case agents identified the owner of the folder as Christopher A. Younger, Pewaukee, WI. After analyzing the information from the binder, case

agents believe Younger spent at least $664,163.00 on at least 200 pounds of various grades of high-grade marijuana that he received from David Makar, Tim Dye, and Jason Glavis between March 2009 and late February 2010. The information from the binder appears to map out an elaborate drug trafficking organization (DTO) between Younger in Milwaukee and his sources of marijuana supply, Makar, Dye, and Glavis, in Northern California.

15.    Contained within the notations, was a bank account number of an account referenced as an "estate account" number, #XXXX-XXX-036. Based on the investigation to date, including the review of voluminous bank records and the notations from the binder, I believe Makar and his girlfriend, Perri Forghani, used this account to transfer/launder their drug proceeds between Younger in Milwaukee and themselves and others in California.

16.    Further analysis of these notes show photocopied business cards, numerous e-mails between Younger and Makar, as well as numerous hand written notes, computer generated spread sheets and U.S. Postal shipping receipts. Case agents have extensively analyzed all the recovered drug notes and the other items in the folder. It appears that Younger does conduct some limited legitimate business under the name Olympia Metals. However, the larger majority of the items in the binder (at least 80% or more) evidence Younger's marijuana trafficking and associated money laundering activities with the DTO.

17.    The binder contained a hand drawn diagram of dimensions of a box that could be used to store/conceal drugs during transport. There is also a photocopy of a package sales label for a 35 gallon Rubbermaid lockable storage container. Based on my training and experience, as well as documents and printed e-mails contained in the folder, it was apparent that Younger and Makar were discussing various means to transport the marijuana from California to Milwaukee,

8

including different storage containers that Younger would purchase and send to Makar, and which Makar would then load and send the marijuana.

18.     Case agents examined printed copies of e-mails contained in the binder. Included were at least ten (10) e-mails between Younger and Makar. Below are examples of those e-mails, which I believe are related to the DTO's marijuana trafficking activities, between Younger and Makar:

a.   An e-mail dated 8/9/10, at 11:34 a.m., between Makar (dsmakar@yahoo.com) and Younger (sales@olympiametals.com). The subject line in the e-mail is RE: "break down" and the importance is marked as high. This e-mail is almost a full page long and discusses what case agents believe are three separate grades of marijuana. The e-mail discusses high, medium, and low grades of marijuana and the value of each "product" (grade). The e-mail indicates that one package is short by "2 mini-buildings." It then states "FYI, there's 16 mini's in a building." Case agents believe that this is in reference to 16 ounces in a pound. Case agents believe that Makar is referring to "Mini" as ounces of marijuana and "building" as pounds of marijuana. According to the e-mail, Makar is selling Younger a pound of high grade marijuana for $2900.00 and lower grade marijuana for $1500.00. The e-mail also stated that Makar understands Younger's nervousness considering "asshole." Case agents believe the reference to "asshole" to be law enforcement. Makar referred to shipping packages through UPS to Younger. Makar said "Tim" (Tim Dye) told Makar if the package gets intercepted to go to another computer "(not your own)" and check the package's location/status through its tracking number. Makar instructed Younger "if they caught it, (that's a big if), it will say to call "law enforcement" regarding your shipment "that's when you know it's lost." Makar also told Younger that he (Dye) also said that "UPS is always about running a business. They don't wanna involve themselves with that. As long as you don't throw it in their face...i.e. bad packaging." Case agents believe that Makar was discussing the prices and transportation of the marijuana to Wisconsin. The last paragraph of this e-mail indicated that Younger spent $6,112.00 yesterday (8/8/09) and had a remaining balance of just under $2,800.00. The e-mail further indicated that Makar assumed it may take a week for Younger's "guys to flip those units" (which case agents believe to be marijuana). The e-mail stated Makar would be taking out $1,000.00 from Younger's account for Makar's cut. Makar told Younger, "I'm not driving up there for two building anyway..." Case agents interpret this to mean that Makar is being fronted his $1,000.00 profit for the marijuana and that once Younger sells the marijuana, the money will be replaced in the account.

9

b. Younger's response to the above e-mail from Makar was dated 8/9/09 at 12:03 p.m., and stated that he agrees with Makar's "calculations." Younger instructed Makar to "take your $1,000.00 fee and then you are paid in full to date and leave the balance in the account for future plans." Younger then detailed "trip #2" and restated the numerical calculations that Makar sent to Younger earlier that day.

19.   Case agents have also examined the handwritten drug notes contained in the folder. There are over 20 pages containing handwritten detailed notations. The following are examples of some of the contents of the handwritten notes, all of which I believe based upon my training and experience to be related to the DTO:

a. A hand written note detailing how much revenue could be expected from four pounds of marijuana. These four pounds are labeled in the notes as 1A, 1B, 1SB and 1C. The note breaks down the "cost," "fee," and "misc." Through an analysis of the notes, case agents determined that "fee" is Makar's cut for arranging and shipping the pound of marijuana. This amount varies throughout the binder depending on how large the shipment is. Miscellaneous cost is believed to be the cost to ship the marijuana. According to the notes, the total revenue expected from the four pounds of marijuana was $9,500.00. The total profit is listed as $3,187.50. The notes break down that if "CY" (Younger) will receive 68% or $2,187.50 and "Dave" (Makar) will receive 32% or $1,000.00. After analyzing the notes, case agents believe that Younger and Makar are partners in the marijuana DTO, and the profits are split according to various factors, to include the size of the marijuana shipments, costs associated the transportation, as well as money that was previously owed.

b. A hand written note dated 3/9/09, stating "$300.00 into "Wave runner fund." The note documents a $10,500.00 investment dated Monday, 3/9/09. The next line, dated 3/13/09, lists another investment of $5,200. The note shows a total investment of $15,100. This drug note shows $17,500 was invested with a $2,300 profit totaling $19,800. From this amount, the following payments are deducted: 1) $6,500 on 3/23/09; 2) $2,000 on 3/24/09 at "Jose's"; 3) $2,300 paid on 3/25/09 at "Mo's Irish Pub"; and 4) $5,000 paid on 03/27/09 "At gym." The note shows a balance of $4000 owed. Case agents believe that this note details payments made to Younger by marijuana customers in Milwaukee.

c. A hand written note that stated "Tim Dye, 38501 Eureka Hill Rd., Bridge Barn, Point Arena, CA 95468." Also noted is a post office box address for Dye at PO Box #548, Point Arena CA 95468. Case agents believe, based upon the contents of the binder and other information gleaned from the investigation, that Dye is a marijuana source of supply in California for Younger and Makar.

10

20. Case agents have also extensively examined the computer-generated spread sheets that were located in the binder, and which document Younger's finances related to marijuana trafficking. The following are examples of information from the spreadsheets:

    a. A computer generated spread sheet that tracks costs and profits of four marijuana shipments dated October 2, 5, 7, and 16 of 2009. The spread sheet is broken down into different headings to include quantity, cost per pound, shipping and associated fees, total sales and profit. These notes detail the shipment totals to be 20 ¾ pounds of marijuana at prices ranging from $2000 to $2800 per pound.

    b. A computer-generated chart dated 2/26/10, showing purchases of what appear to be 13 pounds of various grades of marijuana for $17,700. The chart details revenues made in freight costs and mentioned the name "Chad" and "T" (believed to be two of Younger's customers in Milwaukee) with numerical calculations. The note also has the initials "CY" (Younger) and "DM" (Makar) showing that both "CY" and "DM" invested money into the marijuana, and showing "CY" depositing several thousand dollars at "Wells," as well as "CY" mailing $9,000 to "DM." Case agents have confirmed during this investigation that numerous cash deposits have occurred in Wells Fargo accounts controlled by members of the DTO and several packages which case agents believe to contain bulk cash have been mailed to members of the DTO in California.

21. The binder also contained a spread sheet and a handwritten note indicating monies owed and paid to "Tim" (Tim Dye) by "Tony" and Younger dated 11/17/09. This note shows 5 deposits. The following is a break-down of the deposits:

    a. 11/20/09, Friday, a check was deposited for $1000.

    b. 11/23/09, Monday, cash was deposited for $2000 at noon.

    c. 11/24/09, Tuesday, another cash deposit was made of $7010 at 2:00 p.m.

    d. 11/25/09, Wednesday, cash was deposited for $14000 at 2:00 p.m. at "Elsa's".

    e. 12/03/2009, Thursday, in Brookfield, a $58500 cash deposit was made to "TS." "Tony" then invests $12,000 on 12/02/09. The next line shows that "Tim" (Tim Dye) receives $30,800 for 10 pounds of marijuana. "Tim" (Dye) was mailed $7,400 on 12/02/09 and is still owed $23,400. On 3/5/10, $3,000 was mailed "Tim PO Box", and then "Tim" is still owed $20,400.

11

22.     Case agents utilized both court-authorized GPS surveillance and physical surveillance to develop a consistent daily routine of Younger. Utilizing the GPS device, case agents observed Younger making short term contact at several locations in the Milwaukee area that are associated with Younger's marijuana customers, banks, a UPS store in Pewaukee, and the U.S. Post Office in Pewaukee. Case agents believe that Younger was making in-person contact with customers to deliver marijuana or collect money, wire or send money, etc.

23.     Case agents have examined court authorized pen registers on Chris Younger's and David Makar's cellular telephone numbers. Telephone analyzes of Younger's cellular phone, 414-788-2024, reveals that Younger has contacted several of his customers numerous times, as well as the following telephone numbers linked to this investigation:

   a. Jason Glavis, marijuana supplier from California, 415-786-7561 in excess of 350 times, between 7/5/10 and 1/18/11.

   b. David Makar, marijuana distribution partner, 415-488-7332 in excess of 1100 times between 4/21/10 and 1/19/11.

   c. Timothy Dye, marijuana supplier from California, 707-272-3308 in excess 57 times between 11/9/10 and 12/14/10.

24.     Telephone analysis of David Makar's cellular telephone number, 415-488-7332, revealed the following information:

   a. Perri Forghani, Makar's girlfriend, 650-796-4447, in excess of 2000 times between 11/5/10 and 12/30/10.

   b. Chris Younger, 414-788-2024, in excess of 350 times between 11/5/10 and 1/5/11.

25.     On April 2, 2010, at 7:00 a.m., case agents obtained the garbage, which had been left at the curb for pickup, from Younger's residence in Pewaukee, WI. Case agents inspected the contents of the garbage, and found that several documents had been torn into numerous

12

pieces.  Case agents were able to put the pieces back together and retrieve several pertinent

items. These items include:

    a.  An undated UPS store shipping label, bearing the name Chris Younger with an address of "(his street number)" with no street listed and a phone number 414-788-2024 (Younger's number) and showing shipping charges of $55.50.

    b.  A UPS shipping receipt dated 3/22/10, showing 2.45 pounds of actual weight and 7 pounds billable weight, shipped from Chris Younger his address in Pewaukee, WI 53072, #414-788-2024, and shipped to Perri Forghani, 38 Bryant St., Apartment 508, San Francisco, CA 94105. The package was sent at a UPS store in Pewaukee, WI.  Based on the size, weight, and direction of travel, case agents believe the package likely contained U.S. Currency being sent back to Makar at Forghani's address.

    c.  A receipt from the UPS store dated 3/18/10 showing a next day package sent to Perri Forghani, 503, 38 Bryant St., San Francisco, CA 94105, shipped by Chris Younger.  Also located was a hand written notation with "Perri Forghani, 38 Bryant St, San Francisco, CA."

    d.  A receipt from the UPS store dated 3/18/10, sent UPS ground from Chris Younger, Pewaukee, WI, 414-788-2024, shipped to Mr. David Makar, 170 Overlook Dr, Bolinas, CA 94924.

    e.  A hand written notation showing "2,600", "(1) "really dry crumbled when touched & shake & bottom," "(3) mist great, pot of gold and not labeled > bad smelled like hay."  Case agents believe this to be in reference to $2,600 for a pound of marijuana, and references to the quality of marijuana that Younger had.

    f.  A receipt from Pewaukee Post Office dated 3/22/10 showing a Express Mail package, sent to Point Arena, CA weighing 1 pound 2 ounces, paid for in cash.

    g.  A hand written note showing $2300 deposited at Wells 3/23/10, with two tracking numbers and a note stating "1/2 debt eliminated."

    h.  A hand written notation "Dye PO Box 548 Point Arena, CA 94105."

    i.  A computer generated spread sheet listing a project date of 3/24/10 showing a quantity of six and a price of $2600 for a total of $15,600.  Based on the investigation, agents believe that the spread sheet is a note for six pounds of marijuana at $2600 per pound.

13

    j.  A computer generated spread sheet showing a total of $15,600. Also noted was the phrases "owed Dave from last," "owed DM for current," and "total owed by CY to even" with an amount of $24,231.25.

26.    On January 14, 2011, case agents acquired garbage from Younger's residence. Upon inspecting the contents, case agents located several bank statements, as well as the following items:

    a.  A piece of paper with a hand written notation "DM $4,600.00 1-5-11."

    b.  A hand written notation with dates "11/10, 11/24, 12/09, 12/18, 12/24", and written "total owed", along with "$5,270.00." Case agents believe the first note probably means that Younger sent $4,600 to David Makar on January 5, 2011, and the second reflects Younger keeping track of payments and the division of profits generated by their marijuana trafficking.

27.    On January 21, 2011, case agents acquired garbage from Younger's residence. Upon inspecting the contents, case agents located several bank statements, along with the following items:

    a.  A hand written notation with "9:30 Mike, 10:30 Chad, 11:00 - 1:00 Wiz, 1:30 AZ &Tony." Case agents believe this to be a schedule for meetings with Younger's marijuana customers.

    b.  A document showing "(2) banana cush 2,200, (?) Napa Sour," along with "T 2@3,100," and "AZ 2@ 3,200 = 6,400 - 1,000 1/12/11." Case agents believe this to be a note that Younger's customers, T and AZ, received 2 pounds of marijuana at $3,100 per pound and 2 pounds of marijuana at $3,200 per pound, respectfully. Further, AZ paid $1,000 on January 12 to Younger.

    c.  A hand written note stating "need to mail Friday the 14[th]," "AZ pd off 1-15-11," "dep $800 DM 1/14," and "dep $2,500 DM 1/15." Case agents believe the "AZ" notation refers to a marijuana customer.

    d.  A deposit slip from Wells Fargo, dated 1/14/11, showing that $800.00 was deposited into David Makar's account ending 3082.

14

## C. Seizure of Younger's zip drive and subsequent debriefings of Younger

28.     On February 8, 2011, case agents executed a federal search warrant at Younger's residence in Pewaukee, WI. Younger was present at the residence during the search. During the execution of the search warrant, case agents recovered a .22 caliber revolver, $3,000 in U.S. Currency, approximately 1.8 grams of cocaine, marijuana packaging material, and various drug notations in both electronic and written format. Case agents also located a computer portable zip drive which contained detailed records of the drug distribution activities of the DTO. After consulting with an attorney, Younger agreed to cooperate with case agents and has conducted numerous debriefings with case agents since February 8, 2011.

29.     Younger stated he has known David Makar since 1996. Younger met Makar at a nightclub in Milwaukee through mutual friends. Younger stated that Makar moved from Wisconsin to California several years ago when Makar inherited a house left to him from a deceased uncle. In 2008, Younger's business, Olympic Metals, began struggle and Younger contacted Makar and asked for a loan. Younger said Makar then approached him and asked if Younger would be willing to sell high-grade marijuana for Makar. Makar told Younger that Makar could purchase marijuana for approximately $2,300 per pound from his source in California, and would sell it to Younger for approximately $3,000 per pound. Younger and Makar agreed that the marijuana would be shipped via UPS or Fed-Ex to Wisconsin from California. According to Younger, Makar would send suitcases with marijuana inside to Younger. The average amounts of marijuana in the suitcases were three to four pounds per shipment. Younger agreed to receive the packages of marijuana at his home in Pewaukee, Wisconsin from Makar, who lived in Bolinas, California. In turn, Younger would sell the marijuana to various customers in the greater Milwaukee, Wisconsin area. The profits from the

marijuana sales would be split evenly between Younger and Makar.

30.     Once the marijuana was sold in the Milwaukee, Wisconsin area, Younger would send the marijuana proceeds back to California. Younger would either mail bulk U.S. Currency back to Makar in California, wire the money using Makar's Wells Fargo bank accounts, or transfer the money from Younger's accounts to Perri Forghani's accounts in California. Younger told case agents that Forghani is Makar's girlfriend. As detailed below, case agents have received records from both UPS and from Wells Fargo Bank confirming that packages were sent to Younger, as well as money deposited into Makar's and Forghani's accounts.

31.     Younger provided information to case agents about Jason Glavis. Younger stated Glavis is major marijuana cultivator in California and he was introduced to Glavis by Makar. Initially, some of the marijuana Makar supplied to Younger came from Glavis. Eventually, Younger began dealing directly with Glavis. One on occasion, Glavis told Younger that Glavis had over $100,000 in cash at his residence. Younger told case agents that at the time of the debriefing interviews in February/March 2011, Younger owed Glavis $8,000 for three pounds of marijuana that Glavis sent to Younger on consignment earlier in 2011.

32.     Younger stated that in the Spring or Summer of 2010, Glavis sent Younger a two pound package of marijuana. Approximately one week later, Glavis sent Younger another four pound package of marijuana. Younger told case agents that he paid Glavis with bulk US Currency that was sent directly to Glavis in California for these particular shipments of marijuana. Younger further stated that Glavis wanted to drive 20 pounds of marijuana from California to Wisconsin for Younger, but Younger could not come up with the $40,000 needed to purchase the 20 pounds. Younger stated that he does not trust Glavis, and is afraid of him for threats Glavis has made to Younger in the past regarding drug debts owed to Glavis.

16

33.     Younger provided case agents with information about Timothy Dye. Younger stated that Dye was one of his main sources of supply for marijuana in California. Younger told case agents that he has received marijuana directly from Dye in the past, but has also received marijuana that was supplied by Dye, given to David Makar in California, who then shipped the marijuana to Younger for distribution in Wisconsin.

34.     In October of 2008, Dye sent Younger 12 pounds of marijuana that Younger received at his residence in Pewaukee, Wisconsin. Younger stated that Dye asked him to fly to California and drive a large shipment of marijuana back to Wisconsin. Younger stated Dye has people that ship 100-500 pound loads of marijuana to Hawaii, Detroit, Michigan, and New York. Dye has workers that weld hidden compartments into shipping containers to conceal the marijuana. Younger told case agents that Dye also owns two vans that have special grates built inside the vans to conceal the marijuana. Younger stated that Dye is "the money man", and has a large amount of money that Dye made from selling marijuana. Younger stated that Dye lives in California in the summer months, and travels to the Mediterranean Islands to surf in the winter months. Dye also has been requesting that Younger receive larger loads of marijuana, but Younger was not able to sell that much marijuana at one time. Younger stated that Dye is part of a marijuana growers "co-op" in California, in which other area marijuana growers combine marijuana shipments to be distributed to other parts of the United States. These growers also "watch out" for each other's marijuana crops. According to Younger, Dye is currently sending six to eight pounds of high-grade marijuana to a family member who is currently attending classes at UW-Madison.

35.     According to Younger, he made withdrawals at multiple M&I Bank branch locations, in amounts of less than $10,000, in order to avoid the filing of any reports. Younger

17

explained that if a person makes a cash transaction for $10,000 or more, then a bank files a report with the government. Younger stated that if the cash transaction is $9,999 or less, then no report is filed. Younger stated that he has discussed this $10,000 limit with multiple people including David Makar.

36.    Younger started distributing marijuana in approximately September 2008. Younger started selling marijuana because his legitimate business, Olympia Metals, was failing financially and he needed extra money. Younger explained that he and his wife spend approximately $14,000 per month on living expenses including mortgages, car payments, household bills, and entertainment.

37.    Younger frequently prepaid for marijuana. Younger would often collect money from his customers in the Milwaukee area, and use those funds to prepay his sources of supply in California for the next shipment. Younger's methods of payment for marijuana included:

   a.  Mailing packages containing currency to California, specifically to David Makar, Makar's girlfriend Perri Forghani, Jason Glavis, and Tim Dye;

   b.  Going to Milwaukee area Wells Fargo branches and depositing currency to accounts controlled by Makar and Forghani;

   c.  Writing checks from either his M&I Bank or First Bank Financial Center bank accounts. Younger wrote checks related to payment for marijuana to Makar and Jason Glavis; and

   d.  Wire transferring funds to accounts controlled by Glavis.

38.    Makar has two bank accounts at Wells Fargo. One account is an estate account for his deceased uncle. The second account is Makar's personal account.

39.    When Younger needed to pay for a shipment of marijuana, he and Makar typically discussed the payment method and amount over the phone. When Makar requested money to be deposited into his Wells Fargo accounts, he told Younger which account he wanted

18

the deposit to be made to. When a large sum of money was going to be deposited, Makar would tell Younger which accounts he wanted the money deposited to and how much to deposit into each account.

40.     Younger and Makar discussed how to deposit large sums of currency into Makar's bank accounts. During these discussions, Makar told Younger that making currency deposits in excess of $10,000 to a single account would create a red flag with the bank, which could lead the bank to contact law enforcement. Younger stated he had several conversations with Makar about "spreading around" cash deposits between bank accounts and keeping currency deposits under $10,000.

41.     Younger stated he also paid for marijuana by making currency deposits to the Wells Fargo account of Perri Forghani. Forghani is Makar's ex girlfriend. Makar asked Forghani if he could use her accounts to facilitate the transfer of money. Younger stated that Forghani knew that Makar was selling marijuana and knew that the funds that were being deposited into her account were generated by the sale of marijuana.

42.     Younger stated that on one occasion, Makar told Younger that Forghani took a package containing marijuana to UPS. Makar stated that he would have to do something special for Forghani because she was doing them (Makar and Younger) a big favor by assisting in a fashion that was above and beyond anything she had done before. Younger stated that Makar's statements to Younger made it clear that Forghani knew she was dropping off a package that contained drugs.

43.     Cash deposits made to Makar's Wells Fargo accounts often consisted of "front money" for marijuana provided to Younger by his customers. Younger made deposits at the Wells Fargo branches throughout the Milwaukee area. Younger stated that he did not

19

consciously choose one branch location over another; he made deposits at the branch that was most convenient at a given time.  Younger remembers making deposits at the following Wells Fargo branches: Downtown Milwaukee, Highway 100 near Mayfair Mall, East Capitol Drive, and Pewaukee.

44.    Case agents reviewed the contents of the recovered binder and zip drive with Younger.  Younger stated he made the currency deposits related to every entry noted in the binder and every entry made on the notes he maintained on the zip drive.  Younger told case agents that these deposits represented payments for marijuana and expenses associated with the shipping of marijuana.

45.    Case agents reviewed Younger's check writing activities in relation to the DTO. Younger stated that he wrote the memos on the checks so they would look like payments for a legitimate product.  Younger stated that he wrote the memos at the direction of Makar.  Younger stated that he discussed the fact that he was writing memos on the checks with Makar before each of the four deposits.  Younger specifically remembered that Makar was the one who suggested "Estate Sales Items" as the memo for check 1285.  Younger stated that the memos were written on the checks so that bank employees would not get suspicious when the checks were being deposited.  Makar was concerned that the bank would become suspicious that large checks were being deposited to his account for no apparent reason, so he suggested that Younger write memos that would make the funds appear to be payment for legitimate services.  Case agents then asked Younger the purpose of the following checks that were drawn on his accounts made payable to David Makar:

  a.   Check 1283 for $7,000 with memo "Invoice 1036 Master Cylinder Prototypes" –
       Younger stated that this check was for payment of marijuana.

20

b. Check 1285 for $6,500 with memo "Estate Sales Items" - Younger stated that this check was for payment of marijuana.

c. Check 1273 for $18,000 with memo "Short-Term Loan PMT for Steel" - Younger stated that this check was for payment of marijuana.

d. Check 1157 for $2,500 with memo "Antique Auction" - Younger stated that this check was for payment of marijuana.

46.     Younger explained that he sometimes paid for marijuana using legitimate business receipts of his business, Olympia Metals, or loans from third parties. The funds that Younger wired to California or funds paid in the form of check often originated from business receipts or a loan.

## D. Financial Analysis of the DTO

47.     A financial analysis has been conducted of bank accounts identified as belonging to, and/or being used by Makar, Forghani, Glavis, Dye, Younger, and others. That analysis is described below, and is corroborated by the statements made by Younger and the materials found in Younger's binder and zip drive.

48.     Younger's ledgers had notes relating to 27 payments made to "Jason" for a total of $119,500. "Jason" refers to Jason M. Glavis. Younger's ledgers indicated that 16 of these payments were made by mail and the remaining 11 payments were made by wire transfer. During his debriefings, Younger stated that these entries reflected payments for marijuana sales in the Milwaukee area made to California source of supply Jason M. Glavis. Records obtained from Bank of West, First Bank Financial, and Bank of America corroborated Younger's statements and the 11 wire transfer entries in Younger's notes. The records provided by Bank of West show that between May 14, 2010 and August 23, 2010, Glavis' personal bank account received six wire transfers totaling $26,700 from the First Bank Financial account of Olympia

21

Metals, which is controlled by Younger. During the same time period, Glavis received an additional four wire transfers totaling $16,500 from Younger's personal bank account at First Bank Financial. Finally, Glavis received a single wire transfer of $3,000 from a Bank of America account held by Pamela Younger on August 23, 2010. Pamela Younger is the mother of Chris Younger. Glavis withdrew $16,000 of these funds in cash and used $27,000 of the funds to purchase a check payable to the owner of a hydroponics supply store in Santa Rosa, California.

49. Information obtained from Wells Fargo shows that account 3082 belongs to "The Estate of Thomas Sunvold." Public records show that Thomas Sunvold died in 2008 and Makar is the executor of the estate. Wells Fargo documents show that the only signor on account 3082 is Makar. Wells Fargo documents show that there were at least 65 cash deposits totaling $185,290 to account 3082 between August 14, 2009 and February 7, 2011. During the same time period there were 38 cash withdrawals totaling $151,150 from account 3082. Cash withdrawals were typically made within one day of a cash deposit. To date, Wells Fargo has been able to provide the deposit location of 15 of the cash deposits to account 3082. The majority of these deposits (10 out of 15) were made at southeast Wisconsin area Wells Fargo branches.

50. Bank records also show that there were at least four checks from Younger that were deposited to account 3082. On May 17, 2010, Younger wrote a $7,000 check payable to Makar with a memo reading "Invoice 1036 Master Cylinder Prototypes." On April 26, 2010, Younger wrote an $18,000 check to Makar with a memo reading "Short Term Loan PMT for Steel." On May 26, 2010, Younger wrote a $6,500 check payable to Makar with a memo reading "Estate sales items." On October 11, 2010, Younger wrote a $2,500 check to Makar

22

with a memo reading "Antique Auction." All four payments are listed in Younger's binder or zip drive as payments for marijuana. Younger told case agents that he wrote the memos on the checks in order to reduce the chance that a bank teller would become suspicious about the deposits. Younger discussed making the false entries in the memo lines with Makar. Younger specifically remembered Makar suggesting "Estate sales items" be used as a memo.

51. Younger's binder included bank receipts indicating that he deposited cash to a Wells Fargo Bank account number ending in 5076. Records obtained from Wells Fargo Bank verify that Makar is the sole account holder for account 5076. These records also show that there were 49 cash deposits totaling $139,531 to account 5076 between September 15, 2009 and February 7, 2011. During the same period, there were 30 cash withdrawals totaling $132,300.

52. The cash withdrawals were typically made within one day of a cash deposit. To date, Wells Fargo has been able to provide the deposit location of 43 of the cash deposits to account 5076. The vast majority of these deposits (38 out of 43) were made in Milwaukee area Wells Fargo branches.

53. There are 78 dated entries in Younger's binder and zip drive that appear to record deposits Younger made to Makar's bank accounts. The dates and amounts shown in these entries were reconciled to the deposit records provided by Wells Fargo. All 78 entries reconcile to a deposit made into either account 3082 or 5076. The total of these reconciled deposits is $308,411.

54. Records obtained from Wells Fargo Bank verify that Perri Forghani is the sole account hold for account 1036 and lives at the address listed in Younger's notes, 38 Bryant Street, Apt. 503, San Francisco, CA. These records also show that, between October 2010 and November 2010, there were 15 cash deposits to Forghani's checking account for a total of

$56,250. During the same time period there were seven cash withdrawals totaling $46,800 and two transfers to accounts held by Makar totaling $3,250. The withdrawals were typically made within one day of a cash deposit. Younger's ledgers had notes relating to nine deposits to accounts held by Forghani. These nine deposits totaled $37,250 and reconcile to the deposit records provided by Wells Fargo Bank for account 1036. Documentation from Wells Fargo Bank indicates that all deposits referenced in Younger's notes were conducted at Milwaukee area branch locations.

55.    Younger's binder and zip drive contained summary sheets for 62 shipments of marijuana he received. These sheets show the number of pounds contained in the shipment, how much Younger paid for the marijuana, gross revenue received by Younger from the sale of marijuana, amount of expenses incurred by Younger, and profit earned on the sale of the marijuana. The following summarizes the information contained in Younger's summary sheets:

**Table 1**
**TOTAL SCOPE OF YOUNGER DTO FROM 8/4/08 to 2/8/11**

| | | | | | |
|---|---|---|---|---|---|
| Pounds (Kg) Distributed | 265.75 | | | | |
| Gross Revenue from CY Sales | | $807,347 | | | |
| Cost of Goods Sold for CY | | | $664,163 | | |
| CY Expenses | | | | $18,626 | |
| CY Profit | | | | | $124,759 |

56.    Based on the notes of individual transactions that were located in Younger's binder and zip drive that are corroborated by documents provided by Wells Fargo Bank and statements made by Younger during his debrief, a conservative and provable money laundering figure is **$462,771.00** as shown in the table below. This figure does not take into consideration various cash deposits that appear in the Wells Fargo statements that were not specifically corroborated by Younger's notes.

24

**Table 2**
**Provable amount for Money Laundering Conspiracy**

|  |  |  |
|---|---|---|
|  | Cash deposits to WF 5076 (Makar) | $ 127,881 |
| Add: | Cash deposits and Checks to WF 3082 (Estate of Thomas Sunvold) | 190,140 |
| Add: | Currency Mailed to Makar | 67,800 |
| Add: | Cash deposits to WF 1036 (Forghani) and cash mailed to Forghani | 37,250 |
| Add: | Currency Mailed to Forghani | 49,700 |
| Equals: Total amount of funds deposited by Younger into SOS accounts for the purchase of marijuana. |  | $ 462,771 |

57.    Proof that Younger, Makar, Dye, and Glavis joined the agreement knowing its purpose is clearly shown by email correspondence, bank account activity, consensually monitored phone conversations, statements made by Younger, and receipt of marijuana from Makar, Dye, and Glavis. In addition to the information provided above, proof of knowledge for Forghani can be proven by the following:

a.  Younger's statements are corroborated by notes contained on his seized zip drive showing that he transferred a total of at $76,950 to Forghani. Younger mailed Forghani **$8,000** on 03/18/2010 and **$18,000** of 05/05/2010 as payment for marijuana. The $8,000 and $13,700 shipments are corroborated by UPS receipts found in Younger's garbage on 04/02/2010;

b.  Younger made at least $37,250 in cash deposits to Forghani's bank accounts. Younger's binder contained Forghani's full account number, deposit tickets showing cash deposits to Forghani's account, and notes reflecting that Younger made cash deposits to Forghani's account in order to pay for marijuana. Wells Fargo bank records corroborate Younger's statements; and

c.  Younger's cash deposits to Wells Fargo 1036 were typically followed by a same day cash withdrawal by Forghani as illustrated below.

25



## E. Consensually recorded telephone calls and controlled payments

58.    Throughout the course of this investigation since February 8, 2011, under the direction and control of case agents, Younger has placed numerous consensually recorded telephone calls and text messages to Makar, Glavis, and Dye. Many of these phone calls and text messages were discussions about drug debts that Younger owed Makar, Glavis, and/or Dye.

a. On February 9, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the course of this telephone call, Younger and Makar discussed that Makar was "worried" about a package of marijuana that was sent to Younger. Makar wanted Younger to check the status of the package. Younger told Makar that "the eagle has landed" (referring to the package of marijuana that had arrived. Case agents recovered this package of marijuana, and it was determined to contain approximately four pounds of high-grade marijuana). Makar told Younger that

26

there is "three full pounds and then two halves" in the package. Makar then explained the quantity of each of the strains to Younger. Makar's description of the package matched the package recovered by case agents.

b. On February 11, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the conversation, Makar asked Younger if everyone was happy with the "product" (marijuana received on February 9). Younger replied that there had been no complaints. Younger told Makar that he would try to collect the money from his customers over the weekend. Makar told Younger that Makar needed the money because Makar was short on his mortgage, and needed to make a payment.

c. On February 14, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. Younger received a text message from Makar telling him to call the "office," which was code for Makar's pre-paid cell phone. Younger contacted Makar, and Makar asked Younger how he was doing on collecting the drug debt of $16,000.00 for the four pounds of marijuana that was seized by law enforcement on February 9. Younger questioned Makar on the $16,000.00 amount. Makar told Younger that five pounds of marijuana at $3,200.00 is $16,000.00 (one pound of marijuana had been sold prior to law enforcement seizing the four pounds). Makar told Younger that he owed "the local guy" $1,200.00 and $6,200.00 to the "main guy." Younger told Makar that he was attempting to collect the money, and Makar suggested to Younger that he needs to start "rubbing things up."

d. On February 16, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the conversation, Makar told Younger that he was getting a "lot of heat" and told Younger that he had to cover the "local guy" with $6,000.00. Younger and Makar discussed why Younger's customers haven't paid him. Makar told Younger that "they shouldn't be placing orders that they can't cover." Makar told Younger "we have a really nice thing going here, we rival Starbucks with what we do a week."

e. On February 17, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the conversation, Makar asked Younger "is something going to happen today, my neck is on the chopping blocks. I don't deserve this, take that into consideration." Case agents believe Makar was making reference to Younger placing money into Makar's bank account for the supplied marijuana.

f. On February 23, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the conversation, Makar told Younger that he was "freaking out." Younger told Makar that he was "on it" and told Makar to remain calm. Makar told Younger

27

that he "is toast" if he didn't receive money from Younger for the marijuana. Later in the day, Younger again placed a consensually recorded telephone call to Makar. Makar told Younger that tomorrow is "crunch day." Makar told Younger that his supplier was coming over to his residence to take Makar's car as collateral for the debt. Younger asked Makar to stop sending Younger text messages, as the messages were making Younger "nervous." Makar replied to Younger saying, "Welcome to my world."

g. On February 22, 2011, case agents made a deposit of $1,500.00 in pre-recorded U.S. Currency directly into Makar's Wells Fargo bank account. This money payment was purported to be from Younger to Makar as a partial payment for the previously supplied marijuana.

h. On February 24, 2011, case agents again made a deposit of $5,900.00 in pre-recorded U.S. Currency directly into Makar's Well Fargo bank account. The money payment was purported to be from Younger to Makar as a partial payment for the previously supplied marijuana.

i. On March 22, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Makar's cell phone. During the conversation, Younger and Makar discussed why Younger had not paid off his drug debt in full to Makar. Younger told Makar that Younger had lost money on the transaction. Makar replied, telling Younger "well I wouldn't be dealing with these people then." The phone call then ended. As of this date, Younger currently owes Makar several thousand dollars to settle the debt from the four pound marijuana seizure on February 9, 2011.

j. On May 5, 2011, under the direction and control of case agents, Younger placed a consensually recorded telephone call to Tim Dye's cell phone. During the conversation, Younger and Dye discussed Dye's nephew, who resides in Madison, Wisconsin. Dye told Younger that his nephew was receiving large amounts of high-grade marijuana from Dye. Dye told Younger that his nephew was distributing marijuana in the Madison, Milwaukee, and Michigan area. Further into the conversation, Dye asked Younger if he was "still in the market." Younger replied that he was, and told Dye of the "falling out" with Makar. Younger told Dye that Younger felt more comfortable dealing directly with Dye, and not going through Makar. Dye told Younger that they would plan a marijuana shipment during the Fall of 2011. Dye told Younger that harvest time in California is usually in late September. Younger asked Dye if he would have "those two new strands." Dye replied "Do you mean Pineapple and Af-goo?" Dye told Younger that he would have those two strands available because they were so popular last year. Dye stated that Younger needed a "money backer" to finance the marijuana deal, and that Dye would be willing to ship a large amount of high-grade marijuana to Younger if Younger could come up with the money. Toward the conclusion of the telephone call, Dye told Younger that growing

28

marijuana is a 14 Billion dollar a year business in California. Dye stated that marijuana cultivation starts just north of the Golden Gate Bridge, and goes north.

59. On August 13, 2011, case agents in California intercepted a package sent from Indiana to Perri Forghani in California. The package was intercepted at the Federal Express Facility near the San Francisco Airport at approximately 8:30 a.m. (PST). A police K-9 sniffed the package which was sent from Jeremy Taylor, 4962 W. 11th, Indianapolis, IN to Perri Forghani at 38 Bryant St., Apt 503, San Francisco, CA with no telephone number. The police K-9 alerted to the package and a subsequent search warrant was issued to open the package. The package contained a Disney Roller Skates kit. Inside of the package of the toy roller skates were two bundles of U.S. Currency wrapped in carbon paper. The U.S. Currency amounted to $9,020.00. Case agents ultimately tried to contact Forghani at the above address but were unsuccessful. Case agents left a message on a number used by Forghani was were never called back. Case agents were able to make telephone contact with a person who identified himself as Jeremy Taylor. Taylor told case agents he sent the money to a friend, AG, who sold Taylor a vehicle. Taylor said he wrapped the money in carbon paper to hide it from FedEx employees who might want to steal the money. Taylor could not explain why he sent the money in children's roller skates. Taylor said Forghani is AG's girlfriend,

60. During the week of September 5, 2011, case agents in California have attempted to locate Timothy D. Dye. All of the addresses used by Dye and Younger in the past do not lead to a physical address or identifiable parcel number. The address case agents have for Dye, 38501 Eureka Hill Rd., Point Arena, CA, is actually a "drop" area, which consists of a shed and numerous mail boxes where Fed-Ex and UPS drop shipments off for a number of people who live in a remote mountainous area of Mendocino County, CA. During past debriefing

29

statements, Younger told case agents that Dye is "old school" and knows how to cover himself

so he cannot be found unless he wants to be found.  According to Younger, and confirmed to

date by case agents, Dye has nothing in his name.

61.   Based on the above information and the investigation to date, I believe the

following individuals have taken on the following roles in this DTO:

a.  **Christopher A. Younger,** Pewaukee, WI.  Younger was the Milwaukee end of
the DTO's distribution chain.  Younger kept the books for the DTO, received
marijuana from the California sources of supply, distributed the marijuana to
Milwaukee area buyers (usually on consignment), collected the resulting drug
proceeds, and then transferred the drug proceeds through various convert means
to the sources of supply in California.

b.  **David S. Makar,** 170 Overlook Dr., #120L, Bolians, CA.  Believed to be the
California end of the DTO's distribution chain.  Makar was the initial direct link
to the DTO's sources of marijuana supply in Northern California.  Makar
arranged to receive and ship marijuana in California to Younger in the Milwaukee
area via various mail services.

c.  **Perri Forghani,** 38 Bryant St., #503, San Francisco, CA.  Believed to be the
girlfriend of David Makar who assists Makar in California by receiving marijuana
proceeds into her California bank accounts from Younger in the Milwaukee area.
Forghani also causes the transfer of the marijuana proceeds to Makar directly in
the form of cash or by transfer to accounts controlled by Makar

d.  **Jason M. Glavis,** 2061 Woodside Drive, Santa Rosa, CA.  Believed to be a
marijuana source of supply in California for the DTO.

e.  **Timothy D. Dye,** 38501 Eureka Hill Road, Bridge Barn, Point Arena, CA.
Believed to be a marijuana source of supply in California for the DTO.

## V.   CONCLUSION

62.   Based on the facts contained within this affidavit, I believe that probable cause

exists to believe that beginning sometime in 2008, and continuing to February 8, 2011, in the

State and Eastern District of Wisconsin, and elsewhere, David S. Makar, Jason M. Glavis, Perri

Forghani, and Timothy D. Dye:

a. Knowingly conspired with each other, Christopher A. Younger, and others known and unknown, to possess with the intent to distribute and distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(B), and 846; and

b. Knowingly and intentionally conspired with each other, Christopher A. Younger, and persons known and unknown to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), which makes it unlawful for one who knows that property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct a financial transaction in and affecting interstate commerce, which transaction involves the proceeds of specified unlawful activity, with intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.   The specified unlawful activity involved in the offense is the distribution of controlled substances and conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. The object of the conspiracy was to conceal the source, ownership, and control of the proceeds of drug trafficking which were received by Christopher A. Younger. All in violation of Title 18, United States Code, Section 1956(h).

31